HENRY SELSER, respondent,

*v.*

MARGARET JESTER, as executrix, &c., et al., appellants.

[Decided January 9th, 1942.]

On appeal from a decree of the Court of Chancery advised by Vice-Chancellor Woodruff, who filed the following opinion:

"Complainant seeks to have two deeds conveying his home to his now deceased wife, set aside or the title declared to be held in trust for him. He also seeks to have moneys, deposited in a bank account in his name and that a daughter, declared to be his.

"Complainant is seventy years of age. When he married in 1894 he was employed as a brass finisher and has worked continuously at his trade ever since, except for a period of about five months. For the past thirty-five years he has

worked for one employer. Over the years and until just before the institution of this cause he also turned over his wages each week to the woman in charge of his home—to his wife until her death and then to her daughter, the defendant Margaret Jester. His wages have run from $28 a week to $90 a week, or an average of $55 a week. His mother had given him $1,300 when he purchased land and built his home. Savings from his wages provided for building and loan charges, maintenance of the property and for improvements; $2,407 in savings were on hand, secreted in the piano when Mrs. Selser died. This cash and the home property represented all that had been saved from complainant's earnings. Defendants' claim to the real estate and to the money, if sustained, would leave complainant homeless and penniless.

"Mrs. Selser, at the time of her marriage to complainant, was only fifteen years of age. She had not had any educational advantages, could not read and could only write her own name. Prior to the erection of their home in Camden, Mr. and Mrs. Selser had lived in Philadelphia. There she had engaged in a rooming-house venture with another woman, which had resulted in failure. She never worked outside of her own home and her only source of income, except from her husband's earnings, was $10 a week paid as board by Mr. Jester over a period of some years prior to his marriage to Margaret, and, $15 a week paid after his marriage and until the death of Mrs. Selser. There was some testimony indicating that the daughters, when living at home and employed elsewhere, may have given their mother some money. It is quite evident from the testimony that Mr. and Mrs. Selser worked together, together saved something from his earnings and put any possible savings into their home.

"Complainant purchased the ground for his Camden home on August 24th, 1914; the consideration, $500, was provided by complainant's mother. When the building was under construction she gave him an additional $800. Improvements cost about $2,000 and, to make final settlement with the contractor, complainant borrowed $1,500 from a building and loan association. The mortgage was dated February 4th, 1915.

"Excluding the testimony of complainant, it is perfectly obvious from the evidence that Mrs. Selser, uneducated and uninformed in law, feared that her mother-in-law, by reason of her contribution to the purchase of the lot and the erection of the home, might be able to take the title. She asked Mrs. Catherine Sullivan if she thought that her mother-in-law could take the property from her in view of the fact that it was in Mr. Selser's name, and her name did not appear on the deed. Mrs. Sullivan testified that Mrs. Selser told her that she was afraid her mother-in-law would take the property: 'Because she put up most of the money to build the property, and I said, "It is no mortgage on you, it is on the property, as far as I understand," and she said, "I was told if I had it turned over in my name she couldn't take the property off me." ' (Page 79, transcript.) She later told Mrs. Sullivan that her son Harry had used his influence and the matter had been settled to her satisfaction. She added that if Mr. Selser survived her he 'would have everything.' Three years before her death and at a time when she was very ill and had been told by her physician that she could not improve unless she would undergo an operation, Mrs. Selser told Mrs. Sullivan: 'Everything will belong to Henry and it is up to Henry to do whatever he wants with it.'

"To others, she frankly stated that she intended to secure title in her own name. From the son, Harry Selser, and others we get a clear picture of methods she used to bring about such a result. She was not a well woman, was quick of temper and, at times, would get into such a condition as to require calling a physician. She continuously argued with complainant and insisted that he have the title to the property, which was in his name, transferred to her name. Harry Selser testified that the situation became so tense that he felt forced to interfere. He talked with his mother and with his father. At that time Mrs. Selser was threatening to leave the home if title was not put in her name; she went so far as to pack her personal clothing, and to announce that she was leaving. She told her son Harry that she only wanted to make certain that title to the home was in her name, and she assured him that everything would go back to his father upon

her death. Harry, thus assured, presented the proposition to his father and persuaded him, for the sake of peace and harmony in the home, to accede to Mrs. Selser's wishes. Harry Selser's testimony, in part, was: 'Q. Who was instrumental, who was the moving factor, if you can recall, in having your dad transfer the title to the property. A. I was instrumental. Q. And just how were you instrumental, what part did you play. A. I told dad there was no use of them fighting all the time, it didn't amount to anything, the whole three of us were together, and the agreement seemed to be satisfactory with all concerned. Q. Just what was that agreement. A. Well, if anything happened to mother first, everything would go back to dad. Q. Did she say that to him. A. Numerous times. Q. Did she say that to him at the time he agreed to transfer the property? A. Yes, the whole three of us were sitting at the table.' (Pages 75 and 76 of transcript.)

"Mr. Selser inquired and was told that a conveyance from a husband to a wife should be made through a third party. On April 28th, 1919, a conveyance was made by complainant and his wife to a daughter, Anna Selser, and, on the same day, there was a reconveyance of the premises to Mrs. Selser. These are the deeds of conveyance which complainant seeks to have set aside.

"Following the making of these conveyances, Mr. and Mrs. Selser lived in harmony until her death on January 29th, 1940. Over this period she praised her husband for his industry and stated to a number of the witnesses that everything would be his upon her death, or, that she wanted him taken care of during his life as she had taken care of him. Complainant had turned over his pay envelope to his wife each week even when she was arguing with him and trying to force him to put title to the home in her name. He continued to turn over his pay envelope to her. From his earnings they kept the property in repair and improvements were added, including a garage. Complainant had the property painted some five times at a cost of about $150 in each instance. Paving, curbing, and cement streets by the City of Camden were put in and the property was underdrained; for these improvements complainant paid about $1,200.

For a sewer connection he paid $144. The garage cost him $600. He paid taxes approximating $200 a year and he made the monthly payments to the building and loan association until the mortgage obligation was fully paid. Thereafter Mrs. Selser put what could be saved in a wallet of the complainant, which she secreted in the piano.

"Nowhere in the testimony was there a suggestion that complainant had any intimation that his wife intended making or had executed a will; nor was there a suggestion indicating any fact or circumstance that would cause Mr. Selser to think otherwise than that his home and his savings would be turned over to him upon the death of his wife, if she predeceased him. Defendants, Mr. and Mrs. Jester, were living in complainant's home and a grandchild had lived there and had been cared for and educated by complainant.

"A few days before the death of Mrs. Selser, complainant counted $2,407 in the wallet in the piano. After counting the money he returned the wallet to its hiding place. The day after the death of Mrs. Selser, Mr. and Mrs. Jester took complainant with them to Philadelphia to purchase suitable clothing for the funeral. Complainant followed his daughter into a store, leaving his son-in-law, Mr. Jester, seated in the automobile. Returning after only a few moments, complainant discovered that Mr. Jester had complainant's wallet in his hand and was counting or arranging the bills. This was admitted by Mr. Jester. The following day Mrs. Jester went to the bedroom of complainant and gave him the wallet. Counting the money, complainant found that there was only $1,900. He asked Mrs. Jester for the balance of $507. She replied that $1,900 was all that she had. Mr. Selser suspicioned that his son-in-law had taken this amount. Some two hours later Mrs. Jester asked her father to put the money in bank. She went to the bank with him and she told the teller to put the money in a joint account, in her name and in that of her father; $1,800 was so deposited. Still trustful of his daughter, who was now to be his housekeeper, complainant gave her $140.

"Mrs. Jester and her husband continued to live with complainant in the home and complainant turned over his pay

envelope each week to her as he had previously turned it over to her mother. She promised to save money for him as had her mother. After three months complainant inquired as to his savings; Mrs. Jester told him that she had saved nothing. Complainant then told his daughter that he would only give her $10 a week. Eleven days later, when he returned home from work, he found that no place had been prepared for him at the table and from that time until final hearing he was compelled to go elsewhere for his food. Indicative of his thrifty habits, complainant testified that he saved $700 from his earnings in the next six months.

"When complainant was asked to testify as to the transaction resulting in the conveyance to his wife, objection was made that such testimony was prohibited by *R. S.* *2:97-2.* Counsel for complainant urged that this is an action *in rem* and that the prohibition of the statute does not apply, citing *Thomas* v. *Thomas, 79 N. J. Eq. 461.* Also, because of the fact that Mrs. Jester has not only been made a defendant as executrix of her mother's estate, but also as an individual, the testimony would be admissible. However that may be, testimony of complainant as to the transaction is not necessary to a decision; other certain, definite and reliable testimony is in the case which, to me, is convincing that the complainant is entitled to have his home returned to him. The fear of Mrs. Selser that her mother-in-law would somehow secure title to the home was so proven; the arguments and threats and the preparations of Mrs. Selser to leave the home were also proven. The understanding that, if title was placed in Mrs. Selser's name, it would be returned to Mr. Selser on her death was so proven. Subsequent declarations of Mrs. Selser, corroborative of complainant's theory of the case, were testified to by disinterested witnesses. Surrounding circumstances, equally persuasive, were also clearly proven. The conveyances here challenged were made without consideration but the presumption of a resulting trust is rebutted by the fact that the conveyances effected the transfer of title from a husband to a wife. Presumption then would be one that the property was put in her name as a settlement. Such presumption is rebuttable by such proof as to leave no reason-

able doubt as to the intention of the parties. *Duvale* v. *Duvale, 54 N. J. Eq. 581;* *Ringold* v. *Ringold, 93 N. J. Eq. 357, 360;* *Cropsey* v. *Cropsey, 88 N. J. Eq. 491, 493.* As I have already stated, no reasonable doubt remains in my mind, after a careful consideration of the evidence, as to the intention of the parties.

"Defendants contend that complainant is barred of relief by laches. The circumstances proven, in my opinion, do not sustain this contention. It is quite evident that Mr. Selser, during all of his married life, trusted his wife to hold and save his earnings for him; that earnings and savings were used generally by Mrs. Selser in and about the home, to clear the home of debt, to make improvements thereon and to maintain it in good condition. There was no denial of the fact that Mr. Selser only took from his earnings sufficient to give him tobacco money and bus fare to and from his work. He was so confirmed in his habit of turning over his pay envelope to the woman of the house that, notwithstanding the fact that immediately following the death of Mrs. Selser his son-in-law took money from his wallet containing his savings, he depended upon his daughter, Mrs. Jester, to be his housekeeper and to care for his money as had his wife.

"Complainant testified most positively to the fact that the first knowledge he had of any will of his wife was after her death when, looking for some tax receipts in a trunk or chest, he discovered the executed paper. At that time the defendants, Mr. and Mrs. Jester, were living in his home. He was very much disturbed at the loss of his wife. He looked to his daughter to continue to operate his home. He apparently hoped that he might continue to live out his life in that home without material change in his habits. When he found, a short time later, that his daughter had taken all of his earnings and allegedly saved nothing therefrom, and was not content even to feed him on the basis of a boarder, he sought the advice of counsel and the bill in this cause was filed. There is in the evidence no indication of any delay on the part of complainant which, in anywise, prejudices the defendants. Mr. Justice Minturn speaking for the Court of Errors

and Appeals in the case of *Silverman* v. *Klussman, 96 N. J. Eq. 621* (at *p. 623*), held:

" 'Neither the parties to the transaction nor the status of the parties has been changed, since the deed was delivered, so as to evolve a condition. of injustice between the present litigating parties, which consideration presents the basic theory underlying the doctrine of laches. *Tooker* v. *Sugar Refining Co., 80 N. J. Eq. 306.'*

"Courts of equity have looked with disfavor on such transactions as those here in question, which divest one of his entire estate. *Fretz* v. *Roth, 70 N. J. Eq. 764; Sanford* v. *Sanford, 101 N. J. Eq. 485.* In the *Fretz Case,* the court held:

" 'Nor does the case at bar seem to us to come within the operation of the general principle stated in *2 Story Eq. Jur.* § *1374* * * *. Its language is as follows, viz.:

" 'Thus, for example if a husband should, by deed grant all his estate or property to his wife, the deed would be held inoperative in equity, as it would in law, for it could in no just sense be deemed a reasonable provision for her (which is all that courts of equity hold the wife entitled to), and in giving her the whole he would surrender all his own interests.'

"In the *Sanford Case, supra,* the court cited the above quotation from the *Fretz Case,* and said:

" 'The court found that in the case before it the husband conveyed only a portion of his property. Nevertheless, the above principle was enunciated as a general principle and with approval. This case has been cited in subsequent decisions by our courts twelve times; ten times in this court and once in the Court of Errors and Appeals, and once in the Prerogative Court. In none of these cases is the principle above stated criticized, modified or set aside.'

"In *Cropsey* v. *Cropsey, 88 N. J. Eq. 491,* Vice-Chancellor Backes, said:

" '* * * looking into the circumstances of this case, we see a singleness of purpose of the husband and the wife, earning and saving in common, to buy a home, create a source of income for both; his daily earnings and income contributing largely to the fund.'

"Vice-Chancellor Emery, in *Clawson* v. *Brewer, 67 N. J. Eq. 201; 58 Atl. Rep. 598,* said:

" 'The facts proved bring the case within the application of the equitable rules relating to specific performance of contracts in the nature of family arrangements or compromises. Such family arrangements changing the legal rights of the parties interested in the estate of a decedent, founded on sufficient consideration, and afterward acted on in good faith and partially performed, will be enforced, although made by parol and in the absence of a formal contract. * * *'

" 'In many cases in our own courts parol agreements to devise property in consideration of services rendered, or other valuable consideration subsequently given, have been specifically enforced, on the ground that the remedy at law would be inadequate, and that such enforcement is necessary in order to prevent fraud, a consideration which excludes the case from the operation of the statute of frauds.'

"Now, as to the bank transaction. Self-evidently, Mrs. Jester considered the money secreted in complainant's wallet in the piano as his. She had been living in the home and she undoubtedly knew that it was money saved from his earnings. A few days before the death of Mrs. Selser there was $2,407 in the wallet. Two days after the death of Mrs. Selser the wallet was in the possession of Mr. Jester, the defendant, and he admittedly was advising his wife to take it and keep it as her property. He admitted that he took at least $100 therefrom. He then returned the wallet to his wife and she gave it back to her father. There was only $1,900 in it. She did not say that her husband had taken $507 but was content to say to her father that $1,900 was all that she had. While her father was still disturbed over the death of his wife and these happenings, she insisted that he put the money in bank. No claim was made by her that any part of the money was hers. She took her father to the bank. Arrived there, she told the bank teller to put it in her father's name and her name. The father testified that he was so worried and disturbed that he could say nothing. Later complainant wished to have a monument placed at his wife's grave. It was ordered through the witness Edward L. Can-

ning. He and his son testified that Mrs. Jester admitted that she had money and promised to pay the bill. Notwithstanding the fact that her father had given her $140 and there was a question as to whether or not her husband had $507 additionally of complainant's money, she presently insisted that her father sign a check on the joint account to pay for this monument. Complainant refused to sign the check but paid for more than half of the monument.

"I am convinced that the moneys in the bank account, in the names of Mr. Selser and Mrs. Jester, are actually the moneys of the complainant, and I am equally convinced that he never intended to make a gift of any part thereof to his daughter. All the surrounding circumstances convince me that in this instance he passively permitted to happen what happened; that he trusted his daughter as he had always trusted his wife; not until he found that Mrs. Jester could not or would not admit saving any money from his earnings, and would not board him, in which he regarded as his home, for $10 a week, was he disillusioned."

*Mr. Jacob L. Furer,* for the appellant.

*Mr. Bartholomew A. Sheehan,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the Court of Chancery by Vice-Chancellor Woodruff.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, WOLFSKEIL, RAFFERTY, HAGUE, THOMPSON, JJ. 15.

*For reversal*—None.